IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 1, 2004 Session

## RAYMOND E. ROLLINS, JR., ET AL. v. THE ELECTRIC POWER BOARD OF THE METROPOLITAN GOV'T. OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

Appeal from the Circuit Court for Sumner County
No. 21221-C     C.L. Rogers, Judge

_____

No. M2003-00865-COA-R3-CV - **Filed June 8, 2004**
_____

This appeal concerns a complaint of negligence filed by the appellants Raymond and Sharon Rollins against the Electric Power Board of Metropolitan Nashville and Davidson County (NES). The alleged negligence involved the cutting and removal by NES of three trees on the appellants' property. The Rollins appeal the trial court's final order in favor of NES. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

J. Todd Moore, T. Holland McKinnie, Perry Moore McKinnie, Franklin, Tennessee, for the appellants, Raymond E. Rollins, Jr. and Sharon L. Rollins.

C. Dewey Branstetter, Jr., Eugene W. Ward, Nashville, Tennessee, for the appellee, the Metropolitan Government of Nashville and Davidson County, Tennessee acting by and through the Electric Power Board.

### OPINION

The facts of this case are basically undisputed. The Electric Power Board of Metropolitan Nashville and Davidson County (NES) acquired an easement over the property of Raymond and Sharon Rollins, located at 177 Cumberland Drive in Sumner County for the purpose of running a 4000 volt power supply over said property to a transformer located on the Rollins' property from which the Rollins' home was supplied. Directly underneath these power lines three trees grew, two maple trees and one walnut tree. These trees, which were planted after the lines were run, had been trimmed by NES on at least two previous occasions. The trees had grown to such an extent that their limbs were "burning in the wires" on NES's power poles. It is likewise undisputed that the tree

limbs had become so involved with the power lines as to require the trimming of at least half of each tree. It is also undisputed that this trimming would more than likely destroy the trees in question. In the course of NES's routine maintenance of power lines in this area, contractors were directed to remove these three trees. In the course of removal and pursuant to NES's policy established for the purpose, representatives of NES attempted to inform the owners of these trees of the impending removal and obtain permission for that removal. In its attempts to comply with this policy, and despite open property line indicators to the contrary, NES contractors contacted the landowner adjacent to the Rollins, Mrs. Dudley Miller. When asked about the trees in question, Mrs. Miller replied that her husband had planted them and gave her permission for cutting and removal of the trees. The Rollins were never informed of the pending removal. In fact they were not aware of that removal until they returned from a vacation and noticed the remaining stumps. Raymond and Sharon Rollins filed suit in Circuit Court for Sumner County, alleging that the trees "were wrongfully cut and removed from the Rollins' property by NES . . ." The plaintiffs alternatively sought recovery for replacement value of the removed trees, diminution of the property value of their lot at 177 Cumberland Drive in Hendersonville, Tennessee, and recovery of three times the timber value pursuant to Tennessee Code Annotated section 43-28-312. NES answered, denying the applicability of section 312, and filed a motion for summary judgment on the basis of sovereign immunity, or in the alternative based on NES's right to remove trees located within its easement for the distribution lines serving the plaintiffs' property. NES's co-defendant Trees, Inc. likewise filed a motion for summary judgment. Plaintiffs responded and on June 7, 2002 the motions were heard.

By order entered June 18, 2002, the court dismissed the claims as to Trees, Inc. and made the following findings pertinent to the claims against NES:

> 2. The Defendant, NES provided power lines to Plaintiff's property since 1951. The Defendant had a prescriptive easement for its power lines on Plaintiff's property. Trees were allowed or placed by homeowners within the easement. Over 30-40 years the trees grew to a height where the limbs contacted the power lines, created power outages, and burning of the trees. Several attempts over the years of trimming occurred. NES finally determined that the trees were a hazard and removed them without first contacting Plaintiff, the proper homeowner. The Court finds that NES has the right to reasonably use and maintain its utility easement and power lines. NES is a governmental entity, per T.C.A. 29-20-101 et seq. T.C.A. 43-28-312 is not applicable to a governmental entity. The only issue is whether the NES action was a reasonable use and maintenance of its easement, a question of fact that is disputed. The GTLA, per T.C.A. 29-20-205 does not bar a claim for employee negligence in deciding it was reasonable and necessary to remove the trees. The Motion for Summary Judgment by NES is therefore granted in part as to T.C.A. 43-28-312 and denied in part as to sovereign immunity.

> 3. By the court's action this matter shall proceed pursuant to GTLA, non-jury, on July 7 and 21, 2002.

With the issues thus defined, the trial court, Honorable C.L. (Buck) Rogers presiding, conducted a full hearing of the cause on December 5, 2002. The plaintiffs' argument at trial centered around an alleged injury to their property rights proximately caused by NES's failure to inform them of the decision to cut the trees rather than to trim them. This argument rests on two postulates:

I.     NES had adopted a policy, paragraph 14.4.2 of which requires NES to make reasonable efforts to obtain landowner permission prior to tree removal.

II.     NES failed to follow this procedure, proximately causing the Rollins' inability to find suitable alternatives to tree removal.

In support of this argument Mr. Rollins gave the following testimony upon direct examination:

Q.     Had NES contacted you prior to removing these trees and asked for your permission to remove these trees and cut them down, what would your response have been?

A.     Don't cut them down; let's try to trim them. If you think you [can't] do a correct job of trimming, let's take those two conductors down, move that transformer out to the street pole and the revenue meter out there, run the service underground into my house - - because the service into my house is already underground from their revenue meter. I would have paid - - gladly paid to run out underground service into my house from that utility pole out to the street, because these subject lines only service my house. That's the alternative I'd have sought.

The NES tree trimming and line clearance policy was introduced as exhibit 2 in the record. Paragraph 14.4 of that policy constitutes the duty argued by the plaintiffs in the trial court and here:

14.4     ROUTINE MAINTENANCE

14.41   NES or its Contractor shall make a reasonable effort to notify owner of the proposed trimming; if owner cannot be contacted, trees will be trimmed according to the National Electric Code, NES Tree Trimming Clearance Requirements, and local ordinances.

14.4.2 NES will make a reasonable effort to obtain permission to remove instead of trim all trees directly under the line.

a)     If permission is granted, all brush and debris will be removed and wood cut into lengths desired by the customer, if not NES will remove all wood.

b)     If customer refuses to necessary trimming, the Tree Trimming Contractors representative or NES representative shall explain FIVE DAY TRIM POLICY to the customer. In this policy customer has five days to hire their own contractor (at customer's own expense) to trim trees to NES specifications. If after five days customer has not had the trees trimmed; then NES Tree Trimming Contractor will return to trim the trees with a police officer present to handle any disagreeable customers.

14.4.3 It is preferred that no trees be directly under primary lines or on easements. Clearance will be obtained by trimming or removing trees in accordance with NES Tree Trimming Clearance Requirements. Obstructions such as limbs, trees, etc. shall be removed with a ten-foot (10 ft) radius around NES poles and equipment such as transformers, fused side lines, side lines, etc.

For its part, Metro presented no expert testimony during the hearing concerning the feasibility of the other options referenced in Mr. Rollins' direct examination. As a result the trial court ordered supplemental proof to be submitted via affidavit or deposition concerning the feasibility and appropriateness of other remedial measures. Metro presented the affidavit of Holly Lively, an engineering supervisor in the Customer Engineering Department for NES. Ms. Lively gave oath that, while it is possible to place a 4000 volt primary service line underground, "this is not something that NES normally or routinely does, and it would not have been offered as an option to an NES customer as any part of discussions concerning tree trimming." Nonetheless, in order to accomplish the underground placement of the 4000 volt primary service line, excavation, backfill and installation of the line was estimated at a total cost of $19,395.00. In addition, the underground primary service line would be placed approximately where the current line is suspended, thereby requiring the removal of the trees to provide a fifteen foot access road to an above ground transformer necessitated by the underground placement. The plaintiffs responded with the affidavits of Raymond Rollins, and Richie Bolin, a licensed electrical contractor. Mr. Bolin estimated the cost of underground installation of a service line at $7,350.00, excluding rock excavation. That estimate assumed that NES would relocate the existing pole-mounted transformer and meter to another existing service pole located on the street fronting the Rollins' property. Relying on Mr. Bolin's estimate, Mr. Rollins asserted in his affidavit that the following three options would have been discussed with NES, had he the opportunity:

6.     None of the three (3) options presented below include replacing the existing, overhead primary service on our property with underground primary service. That scheme would be unnecessarily expensive, does not exist in our neighborhood, would serve no useful purpose and is not required by NES policy. The NES <u>New Individual Residence Handbook</u> provides that for typical residential installation of up to 400 amps, no underground primary service is required. *See* NES <u>New</u>

Individual Residence Handbook, Exhibit 1 to Affidavit of Holly Lively, Figure 16, p. 19. The secondary service line inside my house is 400 amps.

7. The first option that we would have discussed with N.E.S., had we had the opportunity is to replace the overhead, bare 4,000 volt primary conductors on our property with insulated, 12/240 volt, secondary, underground conductors from the street into our house. This alternative would include moving the existing transformer, located 59 feet northwest of our house on N.E.S. pole number 625026, to the existing N.E.S. pole number 6825025 at Cumberland Drive. The service on our property would then be changed from overhead primary to underground secondary. No new transformer would be needed for this option. Underground secondary service exists in our neighborhood. Please see photographs labeled photograph page 1 through 6 and Sketch "A" attached hereto. The cost estimate received for this option is $7,350. Please see the Affidavit of Richie Bolin filed herewith. In my opinion, using this option would have added significantly to the real property value of our home.

8. The second option would be to replace the overhead, bare, 4,000 volt primary conductors on our property with overhead, insulated, 120/240 volt, secondary conductors. This would require the same transformer move described in the option (1) above i.e., move transformer from N.E.S. pole number 6825026 to N.E.S. pole number 6825025 at Cumberland Drive. This option does not require a new pole or a new transformer and is the least costly option. This Option would eliminate the need for tree removal since the overhead conductors are changed from bare 4,000 volt to insulated 110/220 volt. This is the service method used to supply most houses in our neighborhood. Please see photographs labeled pages 11 through 13 and Sketch "B" on the attached exhibits.

9. The third option would be the same as second option as set forth in paragraph 8 above but to include installation of plastic, spiral wound coverings over the insulated, secondary conductors to avoid the necessity of tree trimming or tree removal. This has also been done by N.E.S. and exists today in our neighborhood. Please see photograph labeled pages 7 through 10 on the attached exhibits.

The parties submitted written argument pursuant to the court's order from the bench. On February 6, 2003, the court entered its Memorandum Opinion. The final order of the court was entered on March 10, 2003. Of particular note is the following language from the trial court's order:

Long before the Rollins acquired the property, NES had acquired a prescriptive easement for the purpose of using and maintaining its distribution line. Once NES had acquired the easement, it had the right to use and maintain that easement without providing notice to the property owner, and without seeking the property owner's permission or consent to remove trees located within the easement.

NES is not required to discuss other options with property owners before removing trees located within its easement. The fact that NES may have a policy to contact property owners before removing trees does not create a legal duty to contact a property owner prior to tree removal. While NES may have been careless in identifying the property owner, this careless mistake would not be a breach of any legal duty by NES. NES acted within its legal rights when it removed the trees in question, and the Plaintiffs' complaint should be dismissed.

The Rollins appeal the trial court's order, challenging this conclusion that NES had no duty to notify the Rollins prior to removing the trees instead of trimming them.

There is no dispute that NES has an easement. There is no dispute that the limbs of the trees interfered with the power lines. There is no dispute that more than fifty percent of the trees would have to be trimmed in order to secure NES's easement. Under the circumstances of this case, the only choices which the Rollins claim they would have presented to NES involve its adjustment of its own easement rights in order to preserve three trees located directly within the prescriptive easement and interfering therewith.

This Court is, therefore, presented with a controversy involving the appropriate use of an easement. Our rationale begins with the tenet that an easement is an interest in property conferring upon its holder an enforceable right to use another's property. *See, e.g., Bradley v. Mcleod*, 984 S.W.2d 929, 934 (Tenn.Ct.App. 1998); *Brew v. Van Deman*, 53 Tenn. 433, 436 (1871); *Clayton v. Wise*, 1 Tenn.Civ.App. 620, 638-39 (1910). The case at bar involves an easement by prescription. "An easement by prescription arises when a person acting under an adverse claim of right, makes uninterrupted, open and visible use of another's property for at least twenty years with the owner's knowledge and acquiescence. *Long v. Mayberry*, 96 Tenn. at 382, 36 S.W. at 1041; *Pevear v. Hunt*, 924 S.W.2d at 116." *Bradley*, 984 S.W.2d at 935.

> The holder of an easement has the right to use or alter the affected premises only as reasonably necessary for the use of the easement. Such holder has no right to exclude others from the use of or alteration of the premises so long as there is no interference with the easement privilege. For this reason, the holder of an easement could not be reasonably required to perform any maintenance, repairs or alterations upon the property over which the easement exists, unless such holder has made such maintenance, repairs or alterations necessary by the manner of His use of the easement.

*Yates v. Metropolitan Government of Nashville and Davidson County*, 60 Tenn.App. 719, 726, 451 S.W.2d 437, 441.

As a result, the surface rights of a servient tenement remain in constant tension with the rights of the easement holder to use and maintain the easement of way. The fact that the holder of the easement is a provider of electric power heightens the tension, for it has been said: "Electricity if not

properly safeguarded, is one of the most dangerous and lethal agencies known to man." *Tennessee Electric Power Co. v. Sims*, 21 Tenn. App. 233, 108 S.W.2d 801.

> " * * * One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved, as for example, in giving notice of its dangerous character, and there need be no privity between him and the person injured * * * ."  45 C.J. 846, Sec. 264.

*International Harvester Co. v. Sartain*, 32 Tenn. App. 425, 454-55, 222 S.W.2d 854, 867 (1949).

As a general proposition,

> "[t]he person having the right to use an easement has the right to remove obstructions unlawfully placed thereon, as well as natural obstructions interfering with the use of the easement, so long as there is no breach of the peace.  The theory is that the unlawful obstruction constitutes a private nuisance which the owner of the easement is entitled to abate under the rules applicable to nuisances generally; in doing so, he does not become a trespasser."

25 Am.Jur.2d Easement and Licenses, § 101 (footnotes omitted).  Continuing in this vein, we are persuaded by the following discussion of the owner's rights:

> The owner of the fee may use the property through which the easement runs in any manner he desires, but he may not interfere with the plaintiff's enjoyment of its existing rights in the pipe line.  *Panhandle Eastern Pipe Line Co. v. State Highway Commission*, 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090.  An easement is an interest in real property.  It is expressed not in terms of possession or occupancy but in terms of use.  Therefore, the property of the owner of an easement is taken from him not necessarily when the adverse party occupies the land, but only when he prevents or interferes with the owner's use of the easement.  When that occurs there has been a taking of property from the owner of the easement just as much as if an adverse party had taken real estate which another owned in fee.

*Buckeye Pipe Line Company v. Keating*, 329 F.2d 795, 798 (C.A. 7th 1956); *Accord Tenneco, Inc. v. May*, 377 F.Supp. 941 (E.D. Ky. 1974), affirmed 512 F.2d 1380 (C.A. 6th 1975).  In balancing the rights of the servient tenement to the use of his land against the rights of the dominant tenement holding easement rights in this case, overriding consideration must be given to the nature of the use for which the easement exists.  The very nature of electricity dwarfs other considerations.  It is the supplier of electricity who is charged with the heightened duties for public safety, not the servient estate.  The easement predated the planting of the trees and the trees were planted within the boundaries of the easement itself.  As time passed the trees grew to the point that they could come into contact with a 4000 volt uninsulated electric transmission line.  The duty of the power company

is clear that it cannot allow the trees to become a hazard. This duty as it relates to children is but one example as has been aptly stated: "In view of the deadly and insidious character of high-tension wires and in view of the curiosity of children, their ignorance, heedlessness of danger, and their known love of adventure, the courts have imposed a high degree of care upon persons maintaining electric wires to guard them so that they will not cause injury to children." *Town of Clinton v. Davis*, 177 S.W.2d 848, 851 (Tenn.Ct.App. 1943). *Town of Clinton* involved the well recognized propensity of children to climb trees.

Other cases involve the simple protection of the lines and guarding against a development of such hazards. Closely analagous to the case at bar is *Miller-Lagro v. Northern States Power Co.*, 582 N.W.2d 550 (Minn. 1998) where Northern States Power Company had cut down several trees located on the city right-of-way between the paved roadway and the lot of Miller-Lagro. Said the court:

> We begin our analysis by acknowledging the delicate and sometimes conflicting balance between a public utility's responsibility to provide safe, efficient and reliable power and a landowner's reasonable interest in protecting trees and shrubbery on the landowner's property or on an abutting right-of-way. This is yet another page in the volumes of thoughtful dissertation on the tensions between the rights of a private landowner and the need for public services in our local communities.
>
> . . . .
>
> Most jurisdictions hold however, that "[t]he interest of the abutting owners in trees is subject only to the superior claims of the public." Municipalities generally retain rights to trim or cut down trees in the "interest of public safety, convenience, or health" for such purposes as road improvement, convenience of travelers, and assisting the work of public utilities. While the Lagros have a common law interest in the trees that stood on city land in front of their property, that interest is subordinate to the right of the municipality–here exercised by NSP in its utility line maintenance function–to trim or cut the Lagros' trees in the performance of its public works.

582 N.W.2d 550, 552-53 (Minn. 1998).

This argument suffers from a two-fold weakness. First, the undisputed facts at trial suggest that these trees so interfered with the 4000 volt power line and required so much trimming that they would not survive. Second, in recognition of the ability of any utility easement holder to secure the safe exercise of its rights, whether those rights are obtained by prescription or grant, the Rollins must present proof that the failure of NES to inform, rather than the danger posed by the trees to the safe use of the easement, was the cause of the removal. The Rollins present no such proof. The only showing in the record is a speculation on the part of the landowner as to options which they might

have taken had NES agreed to change the nature of its easement right. This Court cannot disregard the elementary provisions of our common law concerning easements and apply a theory of negligence which lacks the key elements: the breach of a recognized duty which proximately causes injury to the plaintiff. *See McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991). The trial court found that NES reasonably maintained its easement, and the proof of the record does not preponderate against that finding. *See* Tenn. R. App. 13(d). The order of the trial court is affirmed in all respects. The cause is remanded for further proceedings as necessary. Costs of this appeal are assessed against the appellants.

_____
WILLIAM B. CAIN, JUDGE